## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL MURPHY, | ) Docket No. 2:13-cr-00115-NT |
| | ) |
| Defendant. | ) |

### ORDER ON MOTION FOR COMPASSIONATE RELEASE

Michael Murphy filed a *pro se* motion for compassionate release on May 19, 2020. After reviewing the motion, I appointed counsel to represent Mr. Murphy. (ECF No. 67.) Appointed counsel filed the pending amended motion for compassionate release, which the Government opposes. *See* Opp'n (ECF No. 73). I have also considered Mr. Murphy's reply brief. Reply (ECF No. 74). Mr. Murphy's amended motion for compassionate release (ECF No. 70) is **GRANTED** pending the development of an appropriate release plan.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 7, 2013, Mr. Murphy pleaded guilty to one count of conspiracy to distribute and possess with intent to distribute oxycodone, one count of being a felon in possession of a firearm, and one count of possession of a machine gun. Plea Agreement (ECF No. 32). I sentenced Mr. Murphy to 120 months imprisonment on each count to be served concurrently and three years of supervised release. By my calculations, Mr. Murphy has served 86 months. The Bureau of Prisons ("**BOP**"), having considered deductions for good conduct, lists a projected release date of

December 20, 2021. Accordingly, Mr. Murphy has served approximately 72% of the sentence I imposed and 84% of his sentence if good-time deductions are factored in.

At the time of his sentencing, Mr. Murphy, who is now 59 years old, reported his overall health as "poor." Presentence Investigation Report ¶ 59 ("**PSR**") (ECF No. 66-1). The presentence report noted that Mr. Murphy had high blood pressure, high cholesterol, and heart disease. While incarcerated, Mr. Murphy has developed and been treated for skin cancer on his head, chest, shoulders, and back. Medical Chronology Summary (ECF No. 70-1.)

Mr. Murphy also suffers from chronic pain, dating back to two motorcycle accidents, one in 1983, when he broke his leg, and the second in 2012, when he fractured his pelvis, hip, and collarbone, and tore the acromioclavicular joint in his right shoulder. PSR ¶ 59. Mr. Murphy was "scheduled for arthroscopic surgery with Dr. Matthew Bush at Central Maine Medical Center in Auburn, Maine; however he was arrested [in June of 2013] for the instant matter prior to the surgery date. He remains in need of surgery." PSR ¶ 59. In August of 2019, Mr. Murphy was transferred from the BOP's Pensacola Camp to Federal Medical Center Devens ("**FMC Devens**") so that his shoulder could be operated on. Pet.'s Reply 2. BOP medical records state that an x-ray shows "grade three separation of bones in shoulder joint, due to previous motorcycle accident. Orthopedic eval recommended and medical level in the unit increased from 2 to 4." Medical Chronology Summary. BOP medical records reflect that on May 21, 2020, Mr. Murphy was seen for a shoulder evaluation. He was diagnosed with "accelerated arthritis and torn rotator

2

cuff tendons." *Id.* He was scheduled for surgery, but, due to COVID-19, his surgery was postponed indefinitely." *Id.* Mr. Murphy reports that he is in constant pain and that, because of a slip and fall in June of 2020, he now has lost much of the use of his left arm. Am. Mot. 2; Medical Chronology Summary.

BOP lists Mr. Murphy as a Care Level 4 inmate. United States Probation Memorandum 1 (ECF No. 66). BOP defines Care Level 4 as follows:

- Care Level 4 inmates require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care.

- Functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance.

  **Example Conditions:** Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy.

*Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons Clinical Guidance, May 2019 (ECF No. 74-1). According to BOP's Medical Classification Algorithm, only inmates who require daily or nearly daily nursing or therapy interventions are classified at Care Level 4. *Id.* at App. 3.

FMC Devens is reporting that, as of August 11, 2020, one inmate and one staff member have active COVID-19 cases. There have been two inmate deaths from COVID-19 at FMC Devens, and 48 inmates and six staff members have recovered from the virus.

The parties agree that Mr. Murphy has exhausted his administrative remedies by requesting compassionate release from the Warden at FMC Devens. *See* Opp'n 1 n.1. His request was denied in April of 2020. Exhaustion Records (ECF No. 70-2).

## LEGAL STANDARD

Section 3582(c)(1)(A) provides that:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)　　in any case—
>
> 　　(A)　　the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> 　　　　(i)　　extraordinary and compelling reasons warrant such a reduction . . .
>
> 　　　　(ii)　　and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c).

The United States Sentencing Commission's policy statements on compassionate release are found at § 1B1.13 of the sentencing guidelines. Section 1B1.13 provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> 　　(1)(A) Extraordinary and compelling reasons warrant the reduction;
>
> 　　. . . .

>    (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
>    (3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

The Sentencing Commission elaborates on what constitutes "extraordinary and compelling reasons" in the Commentary to § 1B1.13. In discussing medical-based reasons, the Commission writes:

>    (A)  **Medical Condition of the Defendant.—**
>
>    (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>    (ii)  The defendant is —
>
>       (I)   suffering from a serious physical or medical condition,
>       (II)  suffering from a serious functional or cognitive impairment, or
>       (III) experiencing deteriorating physical or mental health because of the aging process,
>
>    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
>    ….

U.S.S.G. § 1B1.13, Application Note 1. The Note addresses age-based and family-based reasons in subdivisions (B) and (C), and then provides: "**Other Reasons.—**As

5

determined by the Director of the Bureau of Prisons,[1] there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

---

[1] Prior to the passage of the First Step Act of 2018 ("**First Step Act**"), only the Director of the Bureau of Prisons could move for modification of a sentence. In December of 2018, Congress amended § 3582(c) to allow inmates to seek a modification of sentence from the courts directly "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (codified at 18 U.S.C. § 3582(c)(1)(A)). Because the Sentencing Commission lacks a quorum, it has not considered whether to amend the commentary to § 1B1.13, in light of the First Step Act. *See United States v. Beck*, 425 F. Supp. 3d 573, 579 n.7 (M.D.N.C. 2019).

Subdivision (D) to Application Note 1 specifies that "the Director of the Bureau of Prisons" may decide if other extraordinary and compelling circumstances exist that warrant compassionate release. U.S.S.G. § 1B1.13, Application Note 1. Following the enactment of the First Step Act, district courts have split on the question of whether it is appropriate for courts to "exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 425 F. Supp. 3d at 579–80, 583. This Court and two others in the First Circuit have concluded that courts may consider other extraordinary and compelling reasons for compassionate release, notwithstanding the language of Subdivision (D) to Advisory Comment 1, after the First Step Act. *United States v. Fox*, 2:14-cr-03-DBH, 2019 WL 3046086, at *2–3 (D. Me. July 11, 2019) (collecting cases, discussing split of authority, and "agree[ing] with the courts that have said that the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive given the statutory change."); *see United States v. Rich*, No. 17-cr-094-LM, 2020 WL 2949365, at *2 n.1 (D.N.H. June 3, 2020) (same); *United States v. Pena*, No. CR 16-10236-MLW, 2020 WL 2798259, at *8 (D. Mass. May 29, 2020) (describing the requirement of subdivision D that the BOP determine that an extraordinary and compelling reason exists as "vestigial and inoperative" after the First Step Act); *see also United States v. Maher*, No. 2:04-cr-00093-GZS, 2020 WL 390884, at *3 (D. Me. Jan. 22, 2020) (declining to exercise the court's discretion under subdivision (D) to conclude that another reason warrants compassionate release). District courts outside of the First Circuit are split on the question. *Compare, e.g.*, *United States v. Lisi*, 440 F. Supp. 3d 246, 250 (S.D.N.Y. 2020) ("[T]he Court finds that the majority of district courts to consider the question have found that the [First Step Act] grant[s] this Court the same discretion as that previously give to the BOP Director, and therefore the Court may independently evaluate whether Lisi has raised an extraordinary and compelling reason for compassionate release."), *and Beck,* 425 F. Supp. 3d at 579–80, 583 (same), *with United States v. Garcia*, No. 4:05-cr-40098, 2020 WL 2039227, at *5 (C.D. Ill. Apr. 28, 2020) (concluding that the definition of "extraordinary and compelling reasons" does not directly conflict with the text of the First Step Act and "therefore conclud[ing that] the policy statement has not been overridden by the First Step Act to allow courts the same discretion conferred to the BOP Director by the Sentencing Commission's policy statement"), *and United States v. Sandoval*, No. CR14-5105RBL, 2020 WL 3077152, at *4 (W.D. Wash. June 10, 2020) (same) (citing ten cases).

## ANALYSIS

As the compassionate release statute and guidelines indicate, I may modify a sentence of imprisonment if I find that: (1) extraordinary and compelling reasons warrant modification, (2) modification accords with the § 3553(a) sentencing factors, (3) the petitioner is not a danger to the safety of any other person or the community, and (4) modification is consistent with applicable policy statements of the Sentencing Guidelines.

### A. Extraordinary and Compelling Reasons

I find that Mr. Murphy is "suffering from a serious physical condition," and "experiencing deteriorating physical health . . . because of the aging process," and that both substantially diminish his ability "to provide self-care within the environment of a correctional facility and from which he is not expected to recover." U.S.S.G. § 1B1.13. Mr. Murphy lives in constant pain to the point that he has been classified as a Care Level 4 inmate, requiring "daily or near daily nursing or therapy interventions." The BOP medical records confirm that Mr. Murphy needs shoulder surgery, but he is unable to get that surgery due to the pandemic.[2]

In addition to his shoulder situation, Mr. Murphy suffers from skin cancer, heart disease, and hypertension. The CDC has advised that "[h]aving cancer currently increases your risk of severe illness from COVID-19" and that having heart disease and hypertension may increase the chance of a severe illness from COVID-

---

[2] I suppose that it is possible that if Mr. Murphy were able to get the surgery that he has needed for over seven years, he might be able to recover. Mr. Murphy's projected release date is December 20, 2021—16 months away. Accordingly, I find that it is not likely that Mr. Murphy will recover, at least during the pendency of his stay in BOP.

19. *See* Centers for Disease Control and Prevention, "Coronavirus Disease 2019 (COVID-19), People of Any Age with Underlying Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 11, 2020) ("**CDC COVID-19 webpage**").[3] Mr. Murphy's constellation of conditions that increase his risk of serious illness from COVID-19, in conjunction with BOP's postponement of shoulder surgery due to the pandemic, provide "other reasons" for modification of Mr. Murphy's sentence. U.S.S.G. § 1B1.13, Application Note (1)(D).

FMC Devens reports, as of August 11, 2020, that there are two active COVID-19 cases at the facility and that there have been 48 inmates and six staff who have recovered. Bureau of Prisons, COVID-19 Cases, available at https://www.bop.gov/coronavirus/ (last visited August 11, 2020). Two inmates have died. *Id.* Active case numbers are down considerably from earlier levels reported by FMC Devens.[4] Testing capacity at FMC Devens has increased,[5] and it appears that FMC Devens's isolation strategies have been helpful in containing the spread of

---

[3] Though the Government is correct that Mr. Murphy has not been diagnosed with the specific heart conditions listed by the CDC (i.e., heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, or pulmonary hypertension), the CDC notes that "having other cardiovascular . . . disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19. CDC COVID-19 webpage.

[4] As of June 9, 2020, FMC Devens was reporting 42 open inmate cases of COVID-19 and five staff cases. Decl. of Megan Shaw, M.D., Clinical Director, (ECF No. 73-1).

[5] As of August 11, 2020, FMC Devens is reporting that 895 tests have been performed with 49 positive results. Bureau of Prisons, COVID-19 Inmate Test Information, available at https://www.bop.gov/coronavirus/ (last visited August 11, 2020). BOP reports a population of 899 inmates. Bureau of Prisons, FMC Devens, available at https://www.bop.gov/locations/institutions/dev/ (last visited August 11, 2020).

COVID-19. Decl. of Megan Shaw, M.D., Clinical Director. While the situation at FMC Devens has improved, and it appears that the BOP has acted responsibly to contain the spread of the disease within FMC Devens, there is no evidence to suggest that FMC Devens will resume the type of surgeries that Mr. Murphy needs. *See* Decl. of Megan Shaw, M.D., Clinical Director.

On these facts, I find that Mr. Murphy has established extraordinary and compelling reasons for a modification of his sentence. Accordingly, I go on to consider the remaining factors. *See* 18 U.S.C. § 3582(c)(1)(A).

### B. The 3553(a) Factors

Section 3553(a) lists seven factors that a sentencing court must consider. The first factor requires courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The second factor requires consideration of the general purposes of sentencing, including:

> the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The third factor involves consideration of "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). The fourth and fifth factors require consideration of the Sentencing Guidelines and any relevant policy statement issued by the Sentencing Commission. 18 U.S.C. § 3553(a)(4)–(5). Sixth, courts are to consider "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

Finally, courts must consider "the need to provide restitution to any victim," 18 U.S.C. § 3553(a)(7). Section 3553(a) begins with a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. 18 U.S.C. § 3553(a).

The Government argues that the § 3553(a) factors counsel against early release, focusing on the need for the sentence to reflect the seriousness of the offense (a multi-month oxycodone trafficking operation during the early part of the opioid epidemic) and the need to protect the public (danger to the community because in addition to drug trafficking, Mr. Murphy also possessed eight firearms, including a rifle that had been modified to be fully automatic). Opp'n 5. The Government also points out that the Mr. Murphy has a lengthy criminal history that includes serious felonies. Opp'n 5.

Mr. Murphy points out that he has served seven years and that he has demonstrated meaningful change. Reply 3. He has completed twenty-five educational courses while in the BOP, including the nonresidential drug treatment course. Reply 3. He argues that he became addicted to pain killers after his 2012 motorcycle accident, and he sold oxycodone to support his own habit. He notes that he was unable to afford the medication because he had no medical insurance. As to dangerousness, Mr. Murphy points out that he has been incarcerated in low risk camps at the BOP. He claims that his risk of reoffending is low given his age and his medical conditions. Finally, Mr. Murphy argues that the Government has failed to show how requiring

him to serve out the last sixteen months of his prison term will advance the goals of sentencing in a way that his prior 86 months of incarceration have not.

When I first sentenced Mr. Murphy, I considered all of the § 3553(a) factors and determined that a term of imprisonment of 120 months was sufficient but not greater than necessary to achieve the purposes of sentencing. That sentence, in my view, reflected the seriousness of the offense, promoted respect for the law, provided just punishment, afforded adequate deterrence, and protected the public.

Only a few factors have changed since I imposed that sentence. For one, Mr. Murphy has made significant efforts towards his own rehabilitation. He has completed twenty-five educational courses, including the BOP's non-residential drug treatment program. Mr. Murphy's steps toward rehabilitation are important. When I sentenced Mr. Murphy, he reported that he had immersed himself in religion and was leading the Bible study group at the Cumberland County Jail. I often hear about pre-sentence "conversions," and, for obvious reasons, I take them with a grain of salt. But Mr. Murphy has used his time in the BOP to improve and rehabilitate himself. This bodes well for his chances of success on supervised release. Mr. Murphy's completion of the BOP's non-residential treatment program is particularly important. Mr. Murphy's criminal history reflects the story of a life negatively impacted by substance use disorder. With the proper treatment and support that can be provided during supervised release, Mr. Murphy has the power to continue turning his life around.

A second change has to do with Mr. Murphy's age and his health. When Mr. Murphy comes out of BOP, he will be nearly 60 years old and suffering from serious physical infirmities. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Dec. 2017) ("Older offenders were substantially less likely than younger offenders to recidivate following release.").

The third factor that must be addressed is the need for the sentence imposed to provide "just punishment" for the offense. At the time of his sentencing Mr. Murphy needed and was scheduled for shoulder surgery. For whatever reason, he did not get that surgery throughout his seven-year term of incarceration. The BOP agrees that Mr. Murphy needs surgery but indicates that it cannot provide it due to the pandemic. Mr. Murphy has lived for seven years with a torn acromioclavicular joint, which is now being assessed as a Grade III injury. Because he has not received the care that he needs, Mr. Murphy has suffered more punishment than the average inmate.

Accordingly, the only changes in the § 3553(a) factors counsel in favor of relief.

### C.     Protection of the Public

The sentencing guidelines direct the courts to consider the safety of the community, which overlaps with one of the § 3553(a) sentencing factors. The Government points to the fact that Mr. Murphy, in addition to dealing drugs, possessed a number of firearms, some of them loaded and one of them converted to be able to fire fully automatically. This is indeed the most concerning factor, as there is no question that the combination of drug trafficking and firearms is dangerous.

Looking back over Mr. Murphy's criminal history, however, two things should be noted. First, of Mr. Murphy's thirteen prior criminal convictions, six were for

operating a vehicle after his license was suspended. He has an additional conviction for failing to stop for the police and one for driving under the influence, when he was determined to have a blood alcohol content of .097. Two of his prior convictions were for growing marijuana and he had a conviction for possessing a Class D controlled substance. These convictions are common among individuals who have untreated substance use disorder. There are two convictions which show a propensity toward violence. First, in 1986, at the age of 26, Mr. Murphy was convicted of assault and battery with a dangerous weapon. PSR ¶ 32. There were no records available to the Probation Office to establish the details of that offense. Second, in 2002, at the age of 41, Mr. Murphy was convicted of domestic battery. PSR ¶ 38. There is no evidence that either of these two violent offenses were committed with a firearm. The most recent of these convictions is now over eighteen years old.

    I do not underplay the seriousness of Mr. Murphy's record, but there is nothing that indicates that Mr. Murphy ever used a firearm against anyone in the commission of any offense. Recidivism rates for someone with Mr. Murphy's record are high, but the risk of re-offense will be just as high in 16 months when Mr. Murphy is scheduled to get out of prison. He is now 59 years old and he has serious physically infirmities, for which he has not been treated in the Bureau of Prisons. Mr. Murphy was involved in the oxycodone trade to support his habit because he needed the drug to deal with his long-term chronic pain. The public safety will be best served by providing Mr. Murphy with an opportunity to get the shoulder surgery he needs and by supervising him throughout his recovery. With assistance from the United States Probation

Office, Mr. Murphy may find that he now can get health insurance[6] and attend to his physical and mental health needs. I see little percentage to be gained by requiring Mr. Murphy to stay incarcerated for 16 more months in a facility that cannot meet his medical needs.

### D. Plan for Release

While I find that Mr. Murphy has met the requirements for compassionate release, an acceptable release plan still needs to be developed and approved. Mr. Murphy proffers that he can reside with his brother if released. The United States Probation Office is hereby directed to review Mr. Murphy's release plan and report back to me within ten days whether it is acceptable.

### CONCLUSION

For the foregoing reasons, the Motion for Compassionate Release is **GRANTED**, conditioned upon the development of an acceptable release plan.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated: August 11, 2020

---

[6] It is not clear to me where Mr. Murphy hopes to reside after his release. Many states have taken advantage of Medicaid expansion, and it may now be possible for Mr. Murphy to qualify for health insurance.